Good morning. Good morning. Thank you, Your Honor. May it please the court. My name is Marcel Cinchek, and I represent the plaintiff appellants, Neftali and Mary Lou Monzon, in this civil rights action regarding the wrongful officer-involved shooting death of their son, Juneth Monzon. Your Honor, I'm keeping track of the time as well. I'd like to reserve three minutes for rebuttal. Okay, thank you. The decision of the district court to grant summary judgment should be reversed for three reasons. First, disputed issues of material facts preclude summary judgment. Second, taking all disputed facts and reasonable inferences thereof in plaintiff's favor, a jury could find that the use of deadly force by all of the officers was excessive and unreasonable. And finally, having considered- You know, I'm only speaking for myself right now, because we don't conference until after the case is over. But I would agree with you that there's some disputed facts. But the question is, they have to be material, because you can always have disputed facts, and you are entitled to all inferences. But the question I have is, you claim that the disputed fact is whether any officer was in the van's path when appellants fired. But is that disputed fact really material? In other words, under Wilkinson and the other deadly force cases involving vehicles, isn't it enough that a fleeing suspect is driving generally towards the officers? Because while you can parse this all out, I don't think that the Supreme Court would be supportive of the standard that an officer has to know by the trajectory that it would have missed him by two inches. The officer's faced with a vehicle coming towards him or coming towards his colleagues, and it would appear that they would have a right to defend themselves or defense of the other officers. So can you tell me, and this is also too factually, it's following a high-speed chase, then going down a dead end, and then coming back out. And the vehicle is, it's undisputed that the vehicle is moving towards at least some of the officers. So why are the disputed facts that you're talking about material? Yes, Your Honor. I believe that it doesn't have to be as specific as what Judge Consuelo Callahan had just mentioned in terms of the two inches standard, in terms of the Supreme Court reviewing it. I believe that what this court held in Acosta versus City and County of San Francisco is on point to your question, Judge Callahan. In that decision, the court held that there was four disputed issues of material fact, which were material, which because they were disputed, it precluded summary judgment. The very first one this court held was whether or not the officers were in the path of the vehicle. The two next ones were whether the vehicle was moving, and if it was, how fast the vehicle was moving. And the fourth material fact is where the officers were at the time that they fired. All four of those material facts, just like in Acosta, are also in dispute here. Counsel, counsel, whether this is Judge Van Dyke. So path of the on your first one, whether officers are in the path of vehicle. I think it obviously officers were in the past of this vehicle. If you go, can you hold off for one second? I lost counsel for Syria, city of Marietta. I don't know if that means he's hearing or we've lost him. Your Honor, I I am here and I did. I did listen to Mr. Simpson. Check. You can hear. Yes, Your Honor. OK, because I don't see your picture right now, but OK, go ahead. So on these judge Van Dyke. Yeah. So on these factors, counsel on the path of the vehicle, it's in this. It's got to be undisputed that, you know, this vehicle, it drove in an arc, I think, as you say, in your briefing. It drove in an arc and it drove. And as it turned in that arc at the beginning of that arc, it was aimed, you know, if your officers, Milkoski and Williams, it was aimed to your left, right? Because it's driving like it's going to go drive over on the burn. And it turns. And at some point that turn, it goes to their right and actually runs into one of their cruisers. Right. And so it's impossible for that vehicle to have gone from the left of the officers to the right of the officers without some point having gone being going right straight towards the officers. I mean, that's just a physical impossibility. And not only that, but this all happened in four point five seconds from the time that the vehicle started to the time that the van crashed into the cruiser. So sometime in that one, one thousand two, one thousand three, one thousand four, one thousand five, in that amount of time right there, that vehicle went from going to their right and going to their left. So I think on the first issue, they were clearly in that there was at least two officers clearly in the path of the vehicle. As far as the vehicle moving, there's a lot in the briefs about how slow the vehicle is going. But the maximum speed of the vehicle was 17 point something miles an hour. This is from the black box of the vehicle. And the vehicle actually within, I believe, within one half second, when it first started, the vehicle, according to the black box, went from zero to 12 miles an hour in one half second. Well, 12 miles an hour is going like 15 plus feet per second. So this is all very close proximity. So I, you know, we talk about the vehicle going slow, like it's not going 60 miles an hour or something like that. But I mean, you're these officers that I mean, the whole thing happened in four point five seconds and the vehicle went right into the middle, like literally into the middle of the officers. When it went, we all finished. Zellner was behind the vehicle. And so when in the middle of the officers, the vehicle was moving, I think, in this close proximity at like 15 feet per second or up to 20 feet per second, they were clearly in the path of the vehicle. I just don't see how you can dispute little things. But like Wilkinson says, you have to actually like take into account the whole situation also, right? Yes, your honor. And I would disagree that the officers were in the path of the vehicle during the dispositive time. What's important to the analysis is whether the officers were in the path of the vehicle at the moment that they fired, not sometime before this court has held multiple times. Counsel, let me let me let me push back a little bit on that. I mean, this whole thing happened in four point five seconds. So, you know, you're talking about if we're talking about parsing that four point five seconds is saying, well, was it, you know, where where was the path of the vehicle when when the officers were firing it like, you know, let's say let's say Zellner, presumably, I think you argue that Zellner shot before the vehicle, the van collided with the police cruiser. Well, at that point, the vehicle would have been either aiming towards or moving in a circle that's coming towards the officers that were behind him. But at that moment in time, Judge Van Dyke, Officer Zellner was not shooting to protect any other officers. He shot because he said he was protecting himself. He then he had no idea where the other officers were. So it's key to me. Let me let me push back a little bit on that, because I believe in his in his testimony, says S.E.R. Supplemental Excerpts of Record 284 in his deposition testimony, he was asked. So you didn't know their exact position. Talk about his fellow officers. But you knew they were somewhere behind you when you discharged your firearm. And he said, correct. So I don't think there's anything in the record that says that he wasn't shooting to protect his fellow officers. It did say he was afraid he was going to die. I think he said that. But he didn't say I was only worried about myself. Those things aren't mutually exclusive. Your Honor, I believe that taking the inferences from the record in plaintiff's favor because of his admission that he was shooting because of the fear of his own life was that he was shooting to protect only his life. He never said in the record that he was shooting to protect anybody else's life. And I believe it's too speculative. I don't think that's a reasonable inference from that. A reasonable inference from that is he was shooting because he was in fear of his own life, but not you can't. You can't parse everything. You can't supplement it with things like what would be in someone's mind if they, you know, you speculate that because he was afraid for himself, he wasn't afraid for other people. I would not say that's a reasonable inference. And I would agree with Judge Callahan, counsel. And if you look at Wilkinson, it seems to me that in Wilkinson, it's kind of a similar situation. It said that he was afraid for his own life, fear for the safety of himself and for others. So the court just basically looked at the whole situation and said, upon an objective standard, it would be reasonable for an officer with a vehicle coming right around him in relatively close proximity, close proximity is a quote from Wilkinson, and headed towards two of his fellow officers to use deadly force. But if I may add one thing, I think counsel, if I may add one thing as it relates to that question is, I think you have to look at the entire context. Mr. Monzon was driving 100 miles per hour, so it's endangering the lives of police officers and everyone else. He ran red lights and stop signs, again, endangering the lives of police officers, as well as himself and others. And then they're in this alley, a dead end. And obviously, I think if you look from the perspective of a reasonable police officer, given that their lives have been endangered for the entire time, wouldn't it be reasonable for them to think when a car's coming somewhat towards them, maybe not directly at them, that they would believe that their lives were endangered? Thank you, Your Honors. I want to answer both questions by saying this. Wilkinson versus Torres is distinguishable for here because the dispositive fact in that case was that the shooting officer believed that his partner had already been run over, lost sight of his partner, and thought his partner was going to be run over again. Here, this case is much more similar to AD versus California Highway Patrol, where Judge Lee, just like you said, it was a high-speed chase for a stolen vehicle over 100 miles per hour, running red lights. This is AD, just like our case. It actually ended in a dead-end street, as well, where the van or the suspect vehicle hit a fence post. So far, it's on all fours with our case. Counsel, let me ask you about this. It seems to me that if you think your partner's been run over, and he's already been run over, and you're shooting somebody, I mean, arguably, that's like retaliation or something like that. It seems that officers, they should be able to use deadly force to stop somebody before somebody gets injured. I think we can all agree to that. That's definitely a principle in these cases. So, I guess the question I've got for you, 4.5 seconds, his vehicle's coming around. Nobody says that Zellner started firing at the beginning of the 4.5 seconds. The vehicle went from zero to 12 miles an hour in half a second. So, it was clearly accelerating very fast, coming off. And so, how far did the vehicle need to be from hitting his colleagues behind him before he could take deadly force to try to protect them? And when I say how far, I mean time, because I don't think it doesn't work to talk about distance, because it depends how fast the vehicle's going. So, if the vehicle's two seconds from hitting his colleagues, can he take deadly force or not? Can he use deadly force or not? If the vehicle's headed towards his colleagues, and in two seconds, if it stays going straight, it's going to hit his colleagues, can he use deadly force? Your Honor, I believe that that's inconsistent with the facts of this case. I just want to know whether or not, if that was, in that factual situation, do you believe that an officer could use deadly force? If a vehicle was, let's say three seconds, let's say a vehicle's three seconds, 1, 1,000, 2, 1,000, 3, 1,000. A vehicle's that far, if it stays on its path, it's going to hit your fellow officers. Can you use deadly force? I believe plaintiffs might have to concede that if an officer is in the path, and the vehicle's path is directly towards that officer, then an officer can defend his partner's life by using deadly force. But I don't think that that analysis is directly on point with this case. If we take the time when Officer Zellner used deadly force, at that point in time, he had no idea where his partners were just in some place north of him. He fired to defend himself. Counsel, that's true in Wilkinson, too. He didn't know, I mean, Wilkinson says he didn't know exactly where he thought he might have been run over. He thought he might get run over. That's what the testimony was. But he didn't know where his, that was part of the point. And here's the same thing's true. Zellner says, I didn't know where they were, but I knew they were behind me. He knew that they were generally in the direction the vehicle was going. I think there's a difference between generally in the direction in this case, and in Wilkinson, where the dispositive facts also were that they were in mud, and the vehicle was peeling out, throwing up mud everywhere, and the court found that it could grab traction at any point in time to then run over his partner. If this vehicle wasn't peeling out, it wasn't because, I mean, the accelerator, if you look at what you included on ER, I think 77, excerpts of record 77, 78, the black box, this vehicle had the accelerator pushed down to 84, 80% in the first couple seconds. I mean, he basically had pedal to the metal in the first couple seconds, and then just a couple seconds, or the second, I mean, the first second, and then the second before it actually hit the other vehicle, it was at 99%. So, I mean, only when he's kind of, it looks like he's peeling out, or he would be peeling out, but he's in a Kia van, so maybe you can't peel out in a Kia van. So, I mean, that's one reason why he might not be spinning the tires, but we know he's like full acceleration, essentially. Your Honor, at the time consistent with Officer Zeltner's shots, it actually can see in the EDR data that the accelerator was not being depressed at all. The vehicle slowed from approximately 13 miles per hour to 8 miles per hour, and that's when Mr. Reyes said that Mr. Monzon raised his hands in submission and was giving up, and then Officer Zeltner fired. Okay, that's fine, but the problem with that, and I guess we'll take that fact that he had his hands, but somehow, while he had his hands in the air in submission, the same black box tells us that the wheel cranked from far, because he's got the wheel cranked this way as he's trying to go around Zeltner, and then the wheel cranks about as far as possible this way to try to get in between the second and third cruiser, and so somehow he's got his hands up and he's saying, I'm submitting, but he's also cranking the wheel. I see that my time has expired, Your Honor, may I briefly answer your question? On the second prong of qualified immunity, under Brousseau v. Hagen, it's not enough to point to the general test set out in Graham and Garner for assessing reasonableness. The law has to be clearly established in a particularized sense, and that the conduct must fall outside the hazy border between excessive and acceptable force. What is your best case that clearly establishes the constitutional question here in a particularized sense that an officer would know on the second prong? What's your best case? Your Honor, Acosta v. City and County of San Francisco and AD v. California Highway Patrol are both on point and put the officers on fair notice that they cannot use deadly force when there's no imminent risk of death or serious bodily injury. In both of those cases- Well, how, I guess, what, one officer, something happened to his arm. Explain to me about that. Your Honor, Officer Williams was behind Officer Murkowski's vehicle. At the moment of impact with the van and Officer Murkowski's vehicle, it appears that the vehicle moved back to some extent, and Officer Murkowski, whose arms were up, went through the rear window and his, I believe, his arm got cut. This is not dispositive to the analysis because no one knew about this until later on, and hindsight evidence is prejudicial and is not included in the totality of circumstances. Now, that's also a very important factor to consider because Officer Williams was behind the vehicle. The van crashes. Officer Williams says that it's attached or disabled. Then he runs up to the front of Officer Murkowski's vehicle and then begins to fire 10 rounds. What's very important in this case, very similar to Newmaker versus City of Fontana, is that the autopsy report directly contradicts all of the officer's statements in that the autopsy report shows, and it's undisputed, that all of the rounds that impacted Mr. Monzon were from the side and even from the back. That means at the time that these officers fired, the vehicle had already passed their position. They were already in a position of safety. They were not in the path of the van, and when Officer Murkowski, Officer Williams, and Sergeant Montez fired after the collision, by reasonable inference, the vehicle was not moving at all. Okay. I'm going to give you three minutes for a rebuttal, and so, if you want to have a quick question now, and then we can pull him back on rebuttal. As to what you just said, I think it's clear that Zellner fired before the van collided, but I think the other officers fired after the van collided. But it seems to me like this van had already been on a high-speed chase, had run into fence posts as it was turning around, and it just crashed into the front of their vehicle, knocking that vehicle with enough force to hit their arm. I don't know why an officer in that situation wouldn't think, this guy's going to back up and he's going to come back at us. One question I have for you, and I'll have for your opposing counsel, that relates to Judge Callahan's question. If we were to decide this on the second prong of saucier, like if we were to say, we're not sure about, you know, because you can reach the second prong. If we were to say, but there's no clearly established law, how would that affect your other claims? Wouldn't we still have to decide reasonableness, the reasonableness of the officer's actions, because that would be required by your battery claim and your negligence claim and your Bain Act claim? Or am I missing something there? No, I think, Judge Van Dyke, you're right on point. The first prong of qualified immunity is whether or not the force was reasonable to a reasonable jury. And I think that the court can find that there are facts that a reasonable jury can find that the force was indeed unreasonable, both under the Fourth Amendment violation and under the state law claims. Qualified immunity, the second prong, does not apply to the state law claims at all. And qualified immunity is not established here because the law was clearly established through ACOSTA, through Adams v. Spears, and through AD that just because you're in a vehicle and you're in a high-speed pursuit, no matter how fast the speed was, it's at the time that the officers used the deadly force, is there a person in imminent risk of death or serious bodily injury? Here, the circumstantial evidence shows, and the forensic evidence, that because those rounds came from his side and even from his back, especially after the vehicle crashed and was no longer moving, the force could be seen by a reasonable jury as excessive and unreasonable. OK, thank you. I will give you your three minutes for rebuttal. All right, thank you. Thank you, I really appreciate that. Now I'm going to go to the city of Marietta. Is it possible that now I don't have either? OK, so we're just going to have one counsel at a time then. Is that the way, I guess, it'll work? Yes, Judge. Is your thing checked here? I can still hear you, Judge Callahan. OK, because now I see, I think in order to have the clock, I still have one spare spot. But OK, why don't you go, counsel for Marietta, you have 15 minutes, unless we have additional questions. Go ahead and state your appearance for the record and proceed. Good morning, your honors. May it please the court, Daniel Bearer, B-A-R-E-R, for the city of Marietta and the defendant officers. And first of all, I agree with my colleague that if this case were resolved only on the second prong of qualified immunity, that would leave the state law claims, all of which turn on the reasonableness of the use of force. Also, I'm not sure where the Monell claim is because it wasn't mentioned in the opening brief, but if the Monell claim is still alive, that would not be affected by qualified immunity. Next point is I wanted to address my colleague's focus on the subjective intent of the officers, particularly Officer Zeltner, in the use of force because the law does not focus on the subjective intent. It does focus on the state of mind of the officers in terms of what they knew, but it's whether an objective officer in that situation would use that force. And so whether Zeltner fired to defend himself or to defend his fellow officers is not as important as to whether a reasonable officer in that situation would use force to defend himself or to defend the partners behind him. So, for instance... I need some help from you on some of the... there are some disputed facts here, and the district judge didn't really address those in terms of resolving it on the first prong. And I think there can be disputed facts, but they can't be material facts. And so, assuming all the facts in the appellant's favor, what specific facts made the officers' use of deadly force here reasonable, recognizing that Monson was driving, if you give them the inferences, just 8 miles an hour and was turning toward the opening between the vehicles? So, can you answer that for me? Certainly, Your Honor. Even looking at the facts in the light most favorable to the plaintiff, which both the district court and this court do, the facts in the Van Diver report are undisputed. There is no contrary accident reconstruction report from the plaintiffs. Those facts show that, for instance, when Mr. Monson, according to Mr. Reyes, held his hands up in surrender and said, all right, all right, all right, his Kia was still moving. It didn't stop. That's even conceded on page 41 of the plaintiff's brief. So, I'm not sure what's more dangerous or more scary, somebody driving in your direction with their hands on the wheel or somebody driving in your direction with no hands on the wheel. Plus, the fact that he quickly, as Judge Van Dyke pointed out, started turning the steering column, according to the black box, shows that even if his hands were momentarily up, they went back on the wheel and he started steering towards the officers. And, in fact, he could have gone through the one gap between the Bradley and the Mikowski vehicles if he had kept going with his wheel as it was, but then he cranked it from counterclockwise to straight one second before the collision with Mikowski, showing that a reasonable officer in that position could interpret it as driving towards the officers. Can I ask you a question about that? I mean, it seems to me that, we don't know for sure, but it seems to me there's a possibility that he was turning. I understand an officer looking at this wouldn't necessarily know where he's going to go because he's arcing around and part of that time he's coming towards you, but it does seem like he was trying to hit that space between the two vehicles. One of the reasons he may have let go of it was because it seems like he may have been shot by Zellner as he was going by, and so he may have let go because he may have stopped turning because he's actually been shot. If that was a fact, if we assume that fact is in their favor, how does that affect... I mean, he didn't intentionally drive into the car, into the cruiser. He maybe drove into the cruiser because he was shot. Does that change the reasonableness of the officer's actions? And specifically, I mean, Williams and Mikowski, because it appears like they fired on him after he crashed into their car. It's all happening within 4.5 seconds. It does not affect the reasonableness because the officers don't know whether he is steering intentionally or whether his body's relaxing because he's been shot. They just know what's happening is 4.5 seconds, which is that this two tons of Kia is heading in their direction and that, as the Van Diver report shows, there were significant left and right turns of the steering wheel until it hit Mikowski's vehicle. So that means that in this narrow residential street with a dead end, this van is driving at them, and they don't know whether he's going to narrowly miss them or hit them, and in fact... The officers testified that they positioned their patrol cars in a way to allow the suspect to escape. So given that testimony, shouldn't the officers have expected the suspect to perhaps navigate around them to escape? Yeah, that was coming here. What was the point of leaving him an escape route if the officers could use deadly force as soon as he turned his van around? In other words, what different facts would make the use of deadly force unreasonable from the point Monson executed his turn and began his escape? I don't know why you... I don't know. I don't know the answer to that. But I think what Judge Lee's saying, that raises an interesting point. I would say if all the officers stayed in their vehicle because as soon as Monson got in there, he nearly started turning around and driving out. If they stayed in their vehicles and the risk was just to impact the vehicles, which is still a danger, but not as much a danger, then it might be considered unreasonable. Here the vehicle stopped when it got in there, and the officers got out to go to arrest him on foot because it looked like he was complying because he was stopped. Then he turned around and drove at them. At that point, in those 4.5 seconds, he's driving at them and the use of force is reasonable. None of the cases that my colleagues point out, even going to the one last month, Orne versus City of Tacoma, have found unreasonable use of force where multiple officers have been in the path of the vehicle. Orne made the point that when the officer used deadly force, the vehicle was driving 5 miles per hour, the driver was obeying all traffic laws in the chase, and there was nobody in front of the vehicle. Councilor? I looked at this question that my colleagues are asking about, and admittedly I didn't search through the whole record, but I was trying to find, because it says, I think this is one of the arguments of your opposing council, is they left a path, they can't shoot him for trying to go through that path. I think, as I saw it, the police procedures say you should leave somebody a path. I'm not exactly sure why that is, but it seems like, I'm not sure that I saw that their parking wasn't to leave him a path. It seems to me that the testimony they gave for their parking, they parked in that staggered pattern that you can see in the briefs. It seems to me they did that because of their training so that they don't end up with one car parked right behind the other, and then a car parks behind them, and then they're all stuck to where they can't move. So it's not clear to me that they actually, but maybe I'm missing something, and I'll let your opposing council let me know where in the record it actually says that their reason for doing what they did was to give him an escape path. The second thing that I thought was interesting is somewhere I thought I remember reading that the actual space between the two vehicles, the second cruiser and the third one, was 10 feet. And the vehicle's like six feet, and so I think, if I remember, it might have been in the plaintiff's briefs, one of their briefs somewhere, saying there was plenty of room, but 10 feet is actually really narrow, it seems to me. Trying to drive a six-foot vehicle through a 10-foot hole at full acceleration, which is what this vehicle was doing, is what the KIA was doing just before, I mean, that's scary. That would be really scary if that was happening to any of us. Like somebody was trying to go full acceleration at 18 miles an hour through a 10-foot gap. And so I guess I'm curious as to whether or not the officers actually were deliberate when they parked. Sure, there was some policy, but that they were actually trying to leave them an escape path, or whether they were actually parking in a staggered pattern in order to make sure that they could exfil if they needed to quickly, the way they're trained. I don't recall specifically. I believe that they were parked in a way to leave him an escape path. Okay. I'm curious where that is in the record, because I know there's a policy, but I don't remember seeing that their testimony was that they'd actually done it for that reason. I'm afraid I don't have a specific site to the record for that, Your Honor. That's fine. Unless the court has any other questions, I will submit. Well, let me ask you, do Wilkinson and the other deadly force cases involving vehicles say that the suspect has to be driving directly at an officer, or is the use of deadly force reasonable even whereas here the suspect was driving in the general direction of the officers? If the latter, which cases say that? Wilkinson does not say that the vehicle has to be driving directly towards the other officers. In fact, as was pointed out earlier in the argument, in Wilkinson the shooting officer did not know whether his fellow officer was in the path. He believed that he may have been run over or was in danger running over, but didn't see him because of all the mud being kicked up. And Wilkinson at 610 F3rd, page 551 to 552, says you can't parse it closely when things are happening fast. You have to focus on the urgency of the situation. After all, the court said, the record is uncontroverted that this entire episode occurred in less than nine seconds. Here it occurred in about 4.5 seconds if you measure from the multi-point turn. So out of the urgency of the situation, a van heading in the general direction does make the use of deadly force reasonable. How does the events leading up to it in your view, how would you argue the undisputed facts leading up to it, how would you say those factor in here in the analysis? The chase, the going down the dead end, the turning around, how does that factor in? Well, for one thing, going through a very dangerous high-speed chase, and my colleague has pointed out in the record that there wasn't much traffic there. Mr. Monzon didn't know that when he was driving like crazy. And Scott versus Harris from the Supreme Court says that's a factor for officers to consider in that this person poses a danger not only to the officers, but to the public because he's willing to do desperate things. The fact that he had stolen a vehicle, which is a felony, factors into it because that shows, combined with his objective actions, that he's desperate. His flight, which is one of the Graham versus Conner factors, his resistance to arrest is a factor in showing that use of deadly force may be more reasonable. All of these factors that happened before the shooting show that this gentleman is not going to get caught. And he's going to drive, he's either going to hit an officer or he's going to try to escape no matter who's in his way. Those are all factors which increase the immediate threat of the situation, which is the most important factor in the Graham versus Conner Fourth Amendment analysis. Unless there are further... Okay, did any of my colleagues have further questions? Yeah, I guess I'm just going to, you know, one nice thing about doing this here is we have access to the record and I can search it. And you're searching for the word escape, but I still haven't, I'm all the way into the record and I haven't seen where anybody said, Zellner actually testified that he did not intend to block the escape route, but he didn't say that he intentionally was trying to create an escape route. And importantly, the Supreme Court, I think, has been very clear in the Ninth Circuit, very clear on the escape issue in Tennessee versus Gardner. Quote, when the officer has probable cause to believe the suspect poses a risk of serious physical harm, either to the officer or others, it's not unconstitutionally unreasonable to prevent escape using deadly force. So I guess, again, like you said, under the objective standard, regardless of if the officers were trying to leave him some room to escape, I mean, I don't know how they can be in trouble for not having him left in more room, if it was reasonable for them to think that he, when he was driving through there, the way he was driving through, that he was presenting a risk of serious physical harm to them, or to one of their fellow officers. Tennessee versus Gardner from the Supreme Court says that it's not unreasonable for them to prevent that escape using deadly force. So that seems binding on us. Did you have a response? I didn't hear a question there. So do you want to agree with Judge Van Dyke? I do, Your Honor. Thank you, Your Honors. All right. Your time's expired then. And I did tell counsel for the appellant I would give him three minutes. So we'll wait for him to appear. All right, good. Now I have everyone. Great. OK, thank you. Thank you, Your Honor. I appreciate your generosity with the three minutes. Well, we want to give you your time and have our questions answered. That's really important here. It's obviously an important case to everyone here. Well, I'll jump straight in, and I'll respond to Judge Lee's question and his comment that you are correct, Judge Lee, that the position of the vehicles was to allow him to escape. Now, Judge Van Dyke, in the record at 256 lines 5 through 13, it doesn't say escape. It says that he allows them to continue to flee. So if you were to type in a keyword of flee or go to 256, you would find the record where Officer Mikowski, whose vehicle position is important here because he's going into the gap, specifically parked, he said, two car lengths behind Officer Bradley's vehicle in order for him to have space to continue to flee. Now, it's just like you said, Judge Callahan, that how can the officers justify their use of deadly force when they gave the suspect room to flee, and then when he took the room to flee, they then used deadly force to prevent him from fleeing. This is very similar to the case that this court had just last year in S.R. Maheed v. Browder, where this court recognized the officer's role in creating the danger, that when the officer creates the emergency situation, he cannot then use deadly force to solve it. Now, Judge Van Dyke, what you also brought up with opposing counsel, and correctly, is that one of the shots impacted Mr. Monzon in his chest trajectory from left to right. Now, the only officer shooting from his left through the side window was Officer Zeltner, Officer Bradley, and Sergeant Montez. They all shot just prior to the crash. By reasonable inference, he would have made it, and also in accordance with the defendant's own expert testimony, he was driving through that space, albeit not the largest space in the world, but he was driving through that space and would have made it safely through that space had it not been for the officer shooting at him in the chest when there was nobody in front of the vehicle at that time. So let me ask you, but your opposing counsel said, yeah, but to an objective officer standing there, you don't know why he's driving for a gap, and then all of a sudden he straightens out and runs right into your car. You don't know that. You don't know that. So I don't see – I think he's got a point. It's not particularly relevant why, if that is the reason why he didn't make it through the gap, the other officers don't know that as objective officers. Well, let's focus in, Judge Van Dyke, on the moment right after the collision. Officer Mikowski states that he fired six rounds in rapid succession right after the collision. He said that as soon as he stopped firing, the van started rolling backwards. Now, Officer Williams stated that it took him three to five seconds after the collision to run up to the front of the vehicle where Officer Mikowski was before he started firing ten rounds. By reasonable inference, the vehicle was at least stopped, if not rolling backwards, and could have been rolling backwards because at that point, Mr. Monzon had already been shot a number of times, potentially from Officer Mikowski as well. So, Counselor, if that was true, I guess I was assuming that was true, and I was thinking if I was an officer in that situation, the van comes and crashes at almost 20 miles an hour into my cruiser, knocking that cruiser into my fellow officer, and, I mean, there's glass breaking, there's all this stuff going on, and I'm thinking – and this guy just backed up, ran into a fence post, and then drove towards me. Why wouldn't I think, my goodness, this guy just drove his car into our car. He's going to back up and then take deadly force. I don't see how that changes. I mean, for some seconds after that, it seems to me it would be reasonable for an officer to use deadly force to stop precisely what he had just done like ten seconds earlier at the end of the dead-end street, him backing up and then trying again. Your Honor, if he did back up and try again after the collision with Officer Mikowski's vehicle, based off of their own expert testimony, his route would have been between the gap between Officer Bradley and Officer Mikowski's vehicle. He never tried to harm any officer. He tried to escape. And this court has ruled over and over again in Acosta, AED, Adams v. Spears, that you cannot shoot a fleeing suspect for fleeing. There has to be, and the most important gram factor, which was also elaborated in Tennessee, Well, let me ask you this, though. Is it mutually exclusive? You can be wanting to escape, but that doesn't mean you're not posing a danger either. They're not mutually exclusive, are they? No, Your Honor, they're not mutually exclusive. There could have been a danger in a different scenario. I mean, there could be situations where fleeing is not causing a danger to officers, but there could also be a situation where the flight does cause that. Well, I think we're now going, we're five minutes over, but unless any of my colleagues have additional questions. Anyone have additional questions? All right, thank you both for your very helpful argument. You were both extremely prepared, and it's a difficult case, and we recognize it's important to everyone involved, and it's always a pleasure when counsel is very prepared and knows the record. Thank you very much. All right, it's 9.51 essentially, so I will take a 10-minute recess so that they can configure for the next case. So if we come at 10 straight up, that should put us ready for the next case. Thank you. Have a good day, gentlemen. Thank you. Thank you. Be safe.
judges: Callahan, Lee, Vandyke